Joshua B. Swigart (SBN 225557)
Josh@SwigartLawGroup.com
**Swigart Law Group, APC**
2221 Camino del Rio S, Ste 308
San Diego, CA  92108
P: 866-219-3343
F: 866-219-8344

*Attorneys for Plaintiffs and The Putative Class*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN DOE, individually and on behalf of others similarly situated,<br><br>              Plaintiffs,<br><br>vs.<br><br><br>OPTUM, INC.,<br><br>          Defendant. | Case No: **'25CV0044 WQHJLB**<br><br>CLASS ACTION<br><br>**COMPLAINT FOR DAMAGES:**<br><br>1. **Violation of the Electronic Communications Privacy Act, 18 U.S.C. § 2511(1)**<br>2. **Violation of the California Invasion of Privacy Act, Cal. Penal Code § 631**<br>3. **Violation of the California Confidentiality of Medical Information Act Cal. Civ. Code § 56.10**<br>4. **Invasion of Privacy Under California's Constitution**<br>5. **Violation of the California Computer Data Access and Fraud Act**<br>6. **Cal. Penal Code. § 502 Use of a Pen Register or Trap and Trace Device Cal. Penal Code § 638.51**<br>7. **Violation of the Computer** |

| | |
|---|---|
| | Fraud and Abuse Act 18 U.S.C. § 1030 |
| | 8. Violation of the Stored Communications Act 18 U.S.C. § 2701 |
| | 9. Violation of the Federal Wiretap Act 18 U.S.C. § 2511 |
| | **Jury Trial Demanded** |

Complaint - Class Action

## INTRODUCTION

Plaintiff John Doe ("Plaintiff") brings this class action complaint on behalf of himself and all others similarly situated (the "Class Members") against Defendant Optum, Inc. ("Optum" or "Defendant"). Plaintiff brings this action based upon personal knowledge of the facts pertaining to himself, and on information and belief as to all other matters, by and through the investigation of undersigned counsel.

## NATURE OF THE ACTION

1.  This is a class action lawsuit brought on behalf of all California residents who accessed https://www.Optum.com/ (the "Website"), to research personal health and wellness issues and or obtain medical treatment and/or services. https://www.Optum.com/.

2.  Defendant's website allows its California visitors find a doctor near them, pay a bill, visit the patient portal or become a patient of the defendant. Id.

3.  When engaging with Defendant's online resources, safeguarding personal health information is paramount. Users anticipate that their data will remain confidential and not be disclosed to third parties without explicit consent. This expectation is particularly significant when accessing sensitive health topics, such as mental health or sexual health. Interactions on these subjects may involve deeply personal details, including medical histories and personal experiences, as well as searches involving sensitive medical subjects. The emotionally sensitive and potentially stigmatizing nature of this information underscores the critical

3

Complaint - Class Action

importance of robust data protection measures to maintain user trust and ensure privacy.

4.  Moreover, information concerning an individual's healthcare, including medical procedures, is protected by state and federal law. Despite these protections, and unbeknownst to Plaintiff and Class Members, Defendant aided, employed, agreed, and conspired with various third parties, as more definitely alleged below, to intercept sensitive and confidential communications sent and received by Plaintiff and Class Members, including communications containing protected medical information. Plaintiff brings this action for legal and equitable remedies resulting from these illegal actions.

## PARTIES

5.  Plaintiff John Doe is a natural person and an adult citizen of the state of California, domiciled in San Diego, California.

6.  Defendant Optum, Inc. ("Defendant") is a foreign corporation formed under Delaware laws with a principal place of business in 11000 Optum Circle, Eden Prairie, MN 55344 which operates, amongst other things, a Website known as www.Optum.com that is the subject of this litigation.

### Jurisdiction And Venue

7.  This Court has personal jurisdiction over the Defendant because it has sufficient minimum contacts with this District in that it operates and markets their services throughout the country and in this District.

Complaint - Class Action

8.    Jurisdiction of this Court is proper pursuant to 28 U.S.C. § 1331 because this action arises out of Defendants' violations of the Wiretap Act, 18 U.S.C. §2510 et seq.

9.    Jurisdiction is also established under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d)(2), because Plaintiff, a resident of the State of California, seeks relief on behalf of (1) a national class and (2) a California subclass, which will result in at least one Class Member belonging to a different state than Defendant, a Delaware Corporation with its principal place of business in Eden Prairie, Minnesota.

10.    Plaintiff is requesting statutory damages of the greater of $10,000 or $100 per day for each violation of 18 U.S.C. §2510 et seq and $2,500 per violation of Cal. Penal Code §631, which when aggregated among a proposed class number in the hundreds of thousands, exceeds the $5,000,000 threshold for federal court jurisdiction under CAFA.

11.    Therefore, both diversity jurisdiction and the damages threshold under CAFA are present, and this Court has jurisdiction.

12.    Because Defendant conducts business within the State of California, having otherwise licensed itself to do business in this State and is in good standing.

13.    This Court has supplemental jurisdiction over the remaining state law claims pursuant to 28 U.S.C. §1367 because the state law claims form part of the same case or controversy under Article III of the United States Constitution.

Complaint - Class Action

14.    Venue is proper pursuant to 28 U.S.C. § 1391 for the following reasons: (i) the conduct complained of herein occurred within this judicial district; and (ii) Defendant conducted business as a website in the State of California within this judicial district at all times relevant; and, (iii) Defendant directed significant business activities into the state of California.

15.    Unbeknownst to Plaintiff, Defendant assisted Google and others with intercepting Plaintiff's communications within the State of California, including those that contained personally identifiable information ("PII"), protected health information ("PHI"), and related confidential information. Defendant assisted in these interceptions without Plaintiff's knowledge, consent, or express written authorization. Defendant breached its duties of confidentiality by unlawfully disclosing Plaintiff's PII and PHI.

## **JURISDICTION AND VENUE**

16.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under a law of the United States (the Electronic Communications Privacy Act, 18 U.S.C. § 2511). This Court also has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367. Further, this action is a putative class action, and Plaintiff alleges that at least 100 people comprise the proposed class, that the combined claims of the proposed class members exceed $5,000,000 exclusive of interest and costs, and that at least one member of the proposed class is a citizen of a state different from

Complaint - Class Action

at least one defendant.

17. This Court has personal jurisdiction over the parties because the parties reside in California. Further, Defendant has at all times relevant hereto, systematically and continually conducted business in California, including within this District, and intentionally availed itself of the benefits and privileges of the California consumer market through the promotion, marketing, and sale of its services to residents within this District and throughout California.

18. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendant conducts business in this District and its principal place of business is in this District.

19. Defendant is a Delaware corporation headquartered in Eden Prairie, Minnesota and does business throughout the United States, deriving substantial revenue from interstate commerce in California and has purposeful continuous contact with the residents of California.

**Defendant Has Purposefully Availed Itself To This Forum**

20. The Ninth Circuit Court of Appeals recently held:

> We now hold that if a defendant, in its regular course of business, sells a physical product via an interactive website and causes that product to be delivered to the forum, the defendant "expressly aimed" its conduct at that forum. Though the emergence of the internet presents new fact patterns, it does not require a wholesale departure from our approach to personal jurisdiction before the internet age.

Complaint - Class Action

*Herbal Brands, Inc. v. Photoplaza, Inc.,* 72 F.4th 1085, 1093 (9th Cir. 2023)(footnote omitted).

21.  Defendant expressly aim its conduct at the State of California and the Southern District of California when it marketed physical products, services, and information to California residents via its website.

22.  Optum, Inc. is a subsidiary of UnitedHealth Group, a healthcare services company headquartered in Eden Prairie, Minnesota.

23.  While its primary corporate headquarters are located in Minnesota, Optum operates numerous facilities and services across the United States, including California.

24.  In California, Optum provides a wide range of healthcare services through its various medical groups and facilities.

25.  These services include primary care, specialty care, and personalized healthcare solutions tailored to meet the needs of California residents.

26.  Optum California is a significant arm of Optum's operations, offering healthcare services to individuals and families throughout the state.

27.  This includes a network of clinics, medical groups, and other facilities dedicated to delivering accessible and comprehensive care.

28.  Additionally, Optum maintains an operational presence in California, where it continues to serve as a prominent provider of healthcare services.

29.  According to their website, Defendant has 5,451 locations serving the medical needs of Californians. https://www.optum.com/en/care/locations/california/optum-california/yext-socal-plu-results.html last accessed January 4, 2025.

Complaint - Class Action

30.  In addition, Defendant states on its website in part:

**Optum is a leading medical group in California**

**Personalized care for you and your family**

We can help you and your whole family with all types of medical needs. Our medical care services include:

- Primary care for ongoing care, checkups, minor injuries and illnesses
- Specialty care for outpatient surgery, chronic (long-term) health conditions or problems that need more than primary care
- Urgent care for when your doctor isn't available and you don't have a true emergency
- Virtual care to see a provider from the comfort of your home

**Senior care**

If you need an Annual Wellness Visit, in-home care or preventive care to keep you healthy and independent, we can help.

https://www.optum.com/en/care/locations/california/optum-

california/services.html last accessed January 4, 2025.

31.  Defendant also maintains a corporate office in California located at 2175 Park Pl in El Segundo, California 90245.

32.  Defendant knew that it was going to harm California residents by enabling Google and other Spyware Companies to wiretap the residents' communications and that Defendant intended to wiretap those communications in California. Plaintiff also alleges that Defendant knows specifically which users are in California, including Plaintiff, and that Defendant knew this, continuously, as a result of its specific website code and interactive capabilities above and beyond its website's mere functionality as a nationally accessible, informational website.

Complaint - Class Action

33.  As previously alleged, Defendant affirmatively engaged with Plaintiff's data for advertising and marketing purposes, and the content of Plaintiff's website activity and geolocation information within California was intercepted in real time and while in transit, tracked and shared, including specific search terms typed by Plaintiff during visits to Defendant's website.

34.  Thereafter, that content was instantly communicated by Defendant to third-party spyware companies for purposes of targeting advertising to Defendant's California website users.  Plaintiff's allegations are thus about the knowing and intentional illegal conduct of Defendant's tied directly to the forum.

35.  The Supreme Court has confirmed that contacts may be considered in the jurisdictional inquiry because the "aris[ing] out of or relat[ing] to" standard does not require proximate causation between the contacts and the cause of action but instead "contemplates that some relationships will support jurisdiction without a causal showing."  *Ford Motor Co. v. Mont. Eighth Judicial Dist. Court*, 592 U.S. 351, 361-62 (2021) (emphasis added).

36.  This issue was recently addressed in another case involving privacy claims, *Swarts v. Home Depot, Inc.*, 2023 WL 5615453 (N.D. Cal. Aug. 30, 2023):

> Home Depot contends that Swarts's "generic allegations about Home Depot's sales and business contacts in California fail the but-for test because they are too attenuated from Home Depot's alleged recording of Swarts' chats to support personal jurisdiction." ... Put differently, Home Depot argues that jurisdiction only attaches if Defendant's forum contact gave rise to the claim at issue.  But such a view of the "but-for test" reads the caselaw too narrowly.  As Ford Motor Co. makes clear, the plaintiff need not establish "a strict causal relationship between the defendant's in-state activity and the litigation" to satisfy this element. ... Rather, the suit must only 'arise out of or relate to the defendant's contacts with the forum.' ... At the very least, Swarts's claim that Home Depot recorded online chat

Complaint - Class Action

conversations concerning products he had purchased without his consent relates to Home Depot's connection with the forum, and that is sufficient for this element to be satisfied.") (internal citations and emphases omitted).

*Id.* at *4-5.

37. Defendant may attempt to rely upon the Ninth Circuit's recent decision in *Briskin v. Shopify, Inc.*, 2023 WL 8225346 (9th Cir. Nov. 28, 2023) to support the argument that Defendant's advertising and sales targeting California may not be considered in deciding whether Plaintiff has established the required "something more" needed for personal jurisdiction. However, that case is distinguishable. In *Briskin*, the plaintiff brought a putative class action alleging *Shopify*—a back-end, payment-processing platform—violated various California privacy laws when it collected and retained his personal data. In conducting the jurisdictional inquiry, the court declined to consider *Shopify's* "broader business activities in California outside of its extraction and retention of the plaintiff's data," because whether *Shopify* had a brick-and-mortar store or had contracts with California merchants had "nothing to do" with the alleged data-privacy injuries. *Briskin*, 2023 WL 8225346, at *5.

38. Defendant may attempt to exploit this narrow holding, ignoring the obvious differences between *Briskin* and what Plaintiff has alleged in this case. *Shopify* received data from third-party merchants and was ultimately "indifferent to the location of end users." *Briskin*, 2023 WL 8225346, at *1. Here, as discussed, Plaintiff's claims directly relate to—and in fact arise from—Defendant's attempts to cultivate the California market. Additionally, *Shopify* simply made its platform accessible through a third-party site that happened to be accessible in

Complaint - Class Action

California. Id. at *5. Meanwhile, Defendant has specifically targeted California residents with marketing, use, and sales of its website sales and pharmaceutical services. Further, in *Briskin*, the defendant passively gathered information from individual consumers, that was supplied by merchants, who were themselves "engaged in independent transactions that themselves do not depend on consumers being present in California." Id. As a result, the plaintiff in *Briskin* could have been anywhere when he suffered the alleged injury, and plaintiffs from anywhere could have brought the same claims. Here, the injuries to Plaintiff are specific to California, where Plaintiff resided when the communications on Defendant's website were intercepted in real time and while in transit.

39.    In sum, Defendant took various steps to cultivate an audience and market in California and induce residents in that forum to review and use Defendant's interactive website. This is sufficient to establish the "something more" required for personal jurisdiction based on privacy claims arising from that website.

**Fair Play and Substantial Justice**

40.    Defendant did substantial business directed at California consumers through its website, and that that website contained the SDKs and spyware plugins that caused the harm to Plaintiff and the other Class Members.

41.    Moreover, Plaintiff's claims herein arise out of Defendant's specific activities within this forum, namely, unlawfully intercepting personal communications and information in a manner that violates California consumer protection laws. Those claims would not exist but for the manner in which Defendant developed and deployed its website in California to market and deliver physical goods and

Complaint - Class Action

services into California.  See *Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1322 (9th Cir. 1998).

42.   The exercise of general and personal jurisdiction over Defendant is reasonable and just in this case, especially in light of Defendant's substantial business activities in California; its purposeful availment to this jurisdiction.

43.   Rather than a mere "hunch that [discovery] might yield jurisdictionally relevant facts," Plaintiff has alleged more than sufficient specific pre-discovery facts herein to show that the exercise of both general and personal jurisdiction over this Defendant is both fair play and substantial justice.  *Boschetto v. Hansing*, 539 F.3d 1011, 1020 (9th Cir. 2008).

## **FACTUAL ALLEGATIONS**

### **Background of the California Information Privacy Act**

44.   The California Information Privacy Act ("CIPA"), California Penal Code § 630, *et seq.*, prohibits aiding or permitting another person to willfully—and without the consent of all parties to a communication—read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from or received at any place within California.

45.   To establish liability under California Penal Code § 631(a), a plaintiff need only establish that the defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any

13

telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,

*Or*

Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,

*Or*

Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,

*Or*

Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

46.     Section 631(a)'s applicability is not limited to phone lines but also applies to "new technologies" including computers, the internet, and email. *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *Bradley v. Google, Inc.*, 2006 WL 3798134, at *5–6 (N.D. Cal. Dec. 22, 2006) (CIPA governs "electronic communications"); *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589 (9th Cir. 2020) (reversing dismissal of CIPA and common law privacy claims based on Facebook's collection of consumers' internet browsing history).

47.     Under California Penal Code § 637.2, Plaintiff and Class Members may seek

14

injunctive relief and statutory damages of $5,000 per violation.

**Background of the California Confidentiality of Medical Information Act**

48.    Pursuant to the California Confidentiality of Medical Information Act ("CMIA"), a "provider of health care . . . shall not disclose medical information regarding a patient of the provider of health care . . . without first obtaining an authorization, except as provided in subdivision (b) or (c)." Cal. Civ. Code § 56.10(a). "An authorization for the release of medical information . . . shall be valid if it:

(a)    Is handwritten by the person who signs it or is in a typeface no smaller than 14- point type.

(b)    Is clearly separate from any other language present on the same page and is executed by a signature which serves no other purpose than to execute the authorization.

(c)    Is signed and dated . . .

(d)    States the specific uses and limitations on the types of medical information to be disclosed.

(e) States the name or functions of the provider of health care, health care service plan, pharmaceutical company, or contractor that may disclose the medical information.

(f)    States the name or functions of the persons or entities authorized to receive the medical information.

(g)    States the specific uses and limitations on the use of the medical

15

information by the persons or entities authorized to receive the medical information.

(h)    States a specific date after which the provider of health care, health care service plan, pharmaceutical company, or contractor is no longer authorized to disclose the medical information.

(i)    Advises the person signing the authorization of the right to receive a copy of the authorization."

Cal. Civ. Code § 56.11.

49.    Moreover, a health care provider that maintains information for purposes covered by the CMIA is liable for negligent disclosures that arise as the result of an affirmative act—such as implementing a system that records and discloses online patients' personally identifiable information and protected health information. Cal. Civ. Code § 56.36(c).[3] Similarly, if a negligent release occurs and medical information concerning a patient is improperly viewed or otherwise accessed, the individual need not suffer actual damages. Cal. Civ. Code § 56.36(b).

50.    In addition to any other remedies available at law, any individual may bring an action against any person or entity who has negligently released confidential information or records concerning him or her in violation of this part, for either or both of the following: [¶] (1) ... nominal damages of one thousand dollars ($1,000). In order to recover under this paragraph, it shall not be necessary that the plaintiff suffered or was threatened with actual damages. [¶] (2) The amount

of actual damages, if any, sustained by the patient. *Sutter Health v. Superior Ct.*, 227 Cal. App. 4th 1546, 1551, 174 Cal. Rptr. 3d 653, 656 (2014) (quoting Cal. Civ. Code § 56.36(b)).

51.    Finally, "Every provider of health care . . . who creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information shall do so in a manner that preserves the confidentiality of the information contained therein. Any provider of health care ... who negligently creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information shall be subject to the remedies and penalties provided under subdivisions (b) and (c) of Section 56.36." Cal. Civ. Code § 56.101, subd. (a).

### Google's Platform and its Business Tools

52.    Google's platform and business tools represent a comprehensive ecosystem of products and services designed to support businesses in understanding and engaging with their audiences. Central to this ecosystem is Google Analytics, a widely-used web analytics service that enables website owners to track and analyze visitor behavior on their sites. Google Analytics is a critical tool for measuring the effectiveness of digital marketing efforts, optimizing user experience, and gaining insights into customer interactions. https://support.google.com/analytics/answer/12159447 last accessed December 14, 2024.

53.    The primary purpose of Google Analytics is to collect, process, and report on

Complaint - Class Action

data generated by user activity on a website. This includes tracking page visits, session durations, referral sources, and user interactions, such as clicks, form submissions, and search queries. By analyzing this data, businesses can make data-driven decisions to improve website performance and enhance their online strategies.

54. Google Analytics is installed on websites through the addition of a small piece of JavaScript code provided by Google. This script is embedded into the HTML code of a website, typically in the header section. Once installed, the script automatically tracks user interactions and sends the collected data to Google's servers for processing. The data is then made available to website owners through the Google Analytics dashboard, where they can access detailed reports and insights. Id.

55. The intention of Google Analytics is to empower businesses with actionable information about their online presence. By understanding how users find and interact with their websites, businesses can identify areas for improvement, optimize their content, and increase conversions. For example, tracking the performance of specific marketing campaigns allows businesses to allocate resources more effectively and maximize their return on investment.

56. Google Analytics also enables advanced functionality, such as audience segmentation, e-commerce tracking, and event tracking. Audience segmentation allows businesses to group users based on shared characteristics, such as

Complaint - Class Action

demographics, location, or behavior, enabling personalized marketing efforts. E-commerce tracking provides insights into sales performance, product popularity, and customer purchase paths. Event tracking helps businesses monitor specific user actions, such as video plays or downloads. https://support.google.com/analytics/answer/12799087 last accessed December 14, 2024.

57.    One of the core components of Google Analytics is its ability to integrate with other Google services, such as Google Ads and Google Tag Manager. These integrations allow businesses to align their marketing and advertising efforts with the insights provided by Google Analytics. For instance, combining Google Ads with Analytics data helps businesses understand which keywords and ad placements drive the most traffic and conversions.

58.    Despite its benefits, the use of Google Analytics raises privacy concerns due to its extensive data collection capabilities. When users visit a website with Google Analytics installed, their interactions and device information are logged and associated with unique identifiers, such as cookies. While Google provides options to anonymize data, such as masking IP addresses, concerns remain regarding the potential for tracking user behavior across multiple sites and linking data to user profiles.

59.    Google itself has recognized the risks inherent in attribution to individual users for unique events and information transmitted and has its self recommended the

use of banner ads at the bottom of websites to advise users of the use of this type of tracking and interception technology and provided a means by which website developers who use Google analytics on their websites can lawfully obtain that consent from users before engaging in illegal interception or data sharing. "To capture valuable insights while protecting user privacy, you need to collect consent from your website users. We recommend you use a <u>Consent Management Platform (CMP)</u> or work with your Content Management System (CMS) to collect consent and send it to Google." https://support.google.com/analytics/answer/14565698 last accessed December 14, 2024.

60.  As a result of its activities and operation of the Google Analytics Tag and other third-party software on its website, Google and the other third-parties listed below are able to make extremely personal inferences about individuals' demographics, intent, behavior, engagement, interests, buying decisions, and more.

61.  The personal information and communications obtained by Google and the other third-parties are used to fuel various services offered via Google Analytics including targeted advertising, audience matching, and the like.

62.  Such information is extremely valuable to marketers and advertisers because the inferences derived from users' personal information and communications allows marketers and advertisers, including healthcare providers and insurance

20

Complaint - Class Action

companies, to target potential customers.

63.   Google Analytics Tag is a JavaScript-based code which allows for the installation of its software that allows it to track users, even when third-party cookies are blocked.

64.   Third-party cookie-blocking functions of modern web browsers do not prevent Google or these other third-parties from collecting data through their software on Defendant's website.

65.   Google and these other third-parties never receive consent from users to intercept and collect electronic communications containing their sensitive and unlawfully disclosed information.

66.   Similarly, Defendant never receives consent from users to share medical information with Google and these other third parties.

67.   Users never choose to provide sensitive information to Google or the others because, among other reasons, they never know whether a particular website uses the Google Analytics Tag, and, if so, what sensitive personal data it collects.

68.   Moreover, the Defendant never provides any notice to visitors of its website that there's sensitive personal medical information entered into the search bar at the top of the website page will be shared with third-party advertising and tracking companies, such as Google and these others.

69.   From the instant that a visitor to Defendant's website arrives on its homepage, that visitors interactions are being immediately recorded, intercepted in real time

21

and while in transit, and transmitted in real time simultaneously from that webpage to Google, and these other third parties.

70. Defendant does not provide any sort of pop-up, click wrap agreement, or banner ad of any sort for alerting its website visitors such as the Plaintiff and the Other Class Members that their sensitive medical information will be intercepted in real time and while in transit, and sent to third parties simultaneously with its transmission to the Defendant.

71. Defendant does not offer or require any sort of action on the part of a website visitor, which would provide that visitor with notice of Defendant's real time data interception practices or permit planner for other members of the class the opportunity to have notice, and provide consent for these data practices.

**How A Medical Website Like Defendant Transmits, Confidential Medical Information Through GET And POST Requests**

72. A GET request is an HTTP method used by a web browser or application to retrieve specific information from a server. It is commonly employed when a consumer enters a search term, navigates to a particular page, or interacts with a website's interface.

73. The purpose of a GET request is to send a request to the server, which then returns the requested resource, such as a webpage or data. Importantly, the data sent via a GET request is appended to the URL in plain text, making it inherently unencrypted and visible in the browser's address bar.

74.    Because GET requests transmit data in the open through the URL, any private information included, such as search terms, can be exposed. For example, when a consumer searches for medical symptoms or conditions on a website, those search terms can become part of the visible URL.

75.    This means that any third parties monitoring the connection, including advertisers or analytics companies, can potentially intercept and record this information. The inclusion of such sensitive data in GET requests creates a significant privacy risk, particularly when dealing with medical or other confidential information.

76.    Additionally, GET requests can simultaneously transmit data to third-party websites without the consumer's knowledge or consent. Through the use of tracking scripts and embedded links, a website can forward the URL, including the GET request data, to third-party entities such as advertising networks or analytics providers.

77.    These third parties, like Google Analytics or similar Spyware services, can then collect, store, and process this sensitive information for their own purposes, effectively spying on the consumer's browsing activity.

78.    A POST request, by contrast, is an HTTP method used to send larger amounts of data from the consumer to a server, often as part of form submissions or account interactions.

79.   POST requests are designed to transmit data in the body of the HTTP request rather than in the URL, which can offer better protection for sensitive information.

80.   However, POST requests are not inherently encrypted, meaning that without the use of secure protocols such as HTTPS, the data transmitted via POST requests remains vulnerable to interception by third parties.

81.   In the context of websites that deal with sensitive consumer information, such as healthcare or financial platforms, POST requests can carry private data including names, email addresses, medical history, or even insurance information. This information, if unencrypted, can be intercepted and accessed by unauthorized parties, leading to breaches of confidentiality and consumer trust.

82.   Furthermore, POST requests can also be configured to forward this sensitive data to third-party entities, often without the consumer's awareness or informed consent.

83.   The unauthorized use of POST requests to transmit private medical data to third parties is particularly egregious in the context of consumer privacy rights.

84.   When a consumer enters sensitive health information on a website, they reasonably expect that this data will be handled confidentially and used only for its intended purpose. However, many websites utilize embedded tracking codes that surreptitiously forward this information simultaneously, instantaneously, and in realtime to third-party analytics or advertising companies.

24

Complaint - Class Action

85.  These practices expose consumers to potential harm, including discrimination, identity theft, or unauthorized profiling.

86.  Both GET and POST requests, when misused, create a scenario where the consumer's private data is transmitted in the open and shared without consent.

87.  Websites that fail to implement adequate safeguards or notify consumers about these practices undermine consumer trust and violate their privacy rights.

88.  The unencrypted transmission of search terms, medical data, or other personal information through these HTTP methods constitutes a significant breach of confidentiality, especially when such data is shared with or accessible by third-party entities.

89.  In the digital age, where consumers increasingly rely on websites to access critical information and services, the integrity and confidentiality of their interactions must be protected.

90.  The misuse of GET and POST requests to disclose or transmit private consumer data, particularly sensitive medical information, without explicit consent or transparency, violates fundamental principles of data privacy and consumer protection.

91.  The contents of **Figure 1** below clearly demonstrate that Defendant utilized both GET and POST requests to transmit massive amounts of confidential medical information. This information, which was individually identifiable, was

Complaint - Class Action

transmitted without encryption or consent and was tied directly to Plaintiff and other Class Members.

92. Such actions represent a grave breach of trust and privacy, as the transmitted data included sensitive and personal medical information that should have been safeguarded by Defendant.

93. The evidence provided highlights the systematic and reckless manner in which Defendant facilitated the unauthorized disclosure of individually identifiable medical information, causing harm to Plaintiff and other Class Members.

**How Defendant Disclosed Plaintiff's and Class Members' Protected Health Information and Assisted with Intercepting Communications**

94. Defendant's patients like Plaintiff and other Members of the Class access the Website to search for information about personal medical needs that they may have.

95. Unbeknownst to Plaintiff, Google and the other unrelated third parties ("Spyware Companies") were tracking their activity the moment they entered the Defendant's Website.

96. For example, Defendant embedded the Google Analytics Tag on the Website, which allowed Google to intercept and record "click" events and specific search terms that Plaintiff entered into the website's search bar at the top of each page. Click events detail information about which page on the Website the patient was viewing as well as the selections and search terms they were using.

Complaint - Class Action

97.  Google and the other Spyware Companies intercept information including the specific medical search term they were searching for along with a whole host of other personally, identifying information, transmitted, instantaneously to Google, in order to uniquely identify the user and the device accessing Defendant's website.

98.  By installing the Google Analytics Tag on the Website, Defendant assisted Google with intercepting patients' confidential information related to their medical needs in order to monetize that data for targeted advertising and other purposes.

99.  By installing the software code from these other Spyware Companies, Defendant assisted these Spyware Companies with intercepting patients' confidential information related to their medical needs in order to monetize that data for targeted advertising and other purposes.

100.  These interceptions also included a variety of personally identifying information which Google and the Spyware Companies then utilized to identify its account holders for targeted advertising.

101.  Google and the Spyware Companies used the sensitive medical information it intercepted in real time and while in transit from Defendant's Website into its marketing tools to fuel its targeted advertising service.

102.  Plaintiff never consented, agreed, authorized, or otherwise permitted Google and the Spyware Companies to intercept their confidential health information.

Complaint - Class Action

103.  Plaintiff never consented, agreed, authorized, or otherwise permitted Defendant to share their confidential health information with Google and the Spyware Companies.

104.  By law, Plaintiff is entitled to privacy in their protected health information and confidential communications.

105.  Defendant deprived Plaintiff of their privacy rights when it implemented a system that surreptitiously tracked and recorded Plaintiff's and other online consumers' confidential communications, personally identifiable information, and protected health information.

**Testing Demonstrates that Defendant's Website Share Sensitive Medical Information without Consent with Google and the Spyware Companies**

106.  During routine investigation of the Defendant's Optum.com website, analysis of its network traffic revealed significant transmission of user search term data to numerous third-party entities including Google, and others.

107.  The investigation focused on requests generated during a user search for the term "fibroids," which were recorded in the HAR file provided.

108.  The analysis revealed that Google Analytics received POST requests containing the search term "fibroids" as part of the payload, specifically through the parameter ep.search_term.

109.  This data transmission to Google Analytics enabled the collection of sensitive user information, associating it with session and device identifiers for detailed

behavioral tracking.

110.   In addition, Defendant instantaneously, intercepted and transmitted in real time, sensitive medical search terms from Plaintiff to at least two other spyware companies, Qualtrics and Rakanto, as more further discussed below.

111.   This is by no means a complete list of all of the Spyware Companies which may have received which may have received some of all parts of Plaintiff's sensitive private medical information in search terms that was enabled by the Defendant.

112.   Rather it is simply an abbreviated set of examples of the massive amount of personally identifiable, sensitive medical user data, which is being transmitted by defendant in real time to Google and these other Spyware Companies.

113.   The Defendant's website integration with these third-party services demonstrates widespread transmission of sensitive user information, often without explicit user consent or adequate anonymization.

114.   The inclusion of the unencrypted search term "fibroids" in both GET and POST requests, along with session and device identifiers, creates a significant risk of user profiling and data misuse.

115.   The data-sharing practices identified in this investigation identify massive violations of user privacy expectations and violate numerous applicable laws regulating sensitive health information.

116.   Google and each of these third-party Spyware Companies has collected or processed sensitive health-related search terms from Plaintiff and the other Class

Members, amplifying privacy risks and exposing users to potentially unauthorized data profiling.

**Testing of Defendant's Website Behaviors**

117. As part of the investigation of Defendant's website, Plaintiff's counsel undertook technical testing of this website to determine what information might be instantaneously and in real time transmitted to third parties by Defendant from its website.

118. During this testing, the Plaintiff entered sensitive medical search terms into the search bar, seeking information regarding this medical condition from Defendant's website.

119. Upon entry of the search term for testing, Defendant immediately and instantaneously intercepted this search query and transmitted it to several third parties without the Plaintiff's knowledge or consent.

120. Evidence of this activity was captured in real time using software to monitor the network traffic from Defendant's website.

**Allegations Regarding Defendant's Use of Google Analytics**

**To Intercept And Transmit Sensitive Search Queries**

121. Defendant uses Google Analytics, a third-party tracking tool, to collect and analyze user interactions on its website, including searches conducted by visitors for sensitive medical information.

Complaint - Class Action

122. Defendant's website at the time of Plaintiff's interaction included a search bar that allowed users to enter medical terms to locate relevant information.

123. While visiting Defendant's website in the past year, Plaintiff entered sensitive medical search terms into the Defendant search bar, seeking information regarding this medical condition from Defendant's website.

124. Upon entry of the search term, Defendant immediately and instantaneously intercepted this search query and transmitted it to Google Analytics without the Plaintiff's knowledge or consent.

125. This choice exposed Plaintiff and other users to heightened risks of identification and profiling by third parties, including Google.

126. As a result of these practices, Plaintiff's sensitive medical query was transmitted to Google Analytics, which had the capacity to combine this data with other information it possessed about Plaintiff, including geolocation, demographic data, and online behavior across other websites using Google Analytics.

127. This transmission occurred without any meaningful disclosure to Plaintiff, in violation of Plaintiff's reasonable expectation of privacy.

128. This data, combined with other identifiers such as the session ID and client ID transmitted in the same request, provided Google with the ability to identify and geolocate the Plaintiff with precision.

129. The omission of IP anonymization allowed Google Analytics to link the Plaintiff's search for sensitive medical search terms which Plaintiff had entered

31

with the Plaintiff's full IP address, which is considered personally identifiable information under applicable privacy laws.

130.  This enabled Google to associate Plaintiff's sensitive medical search query with a detailed behavioral profile of Plaintiff across other websites that use Google Analytics, further compounding the privacy harm.

131.  This transmission occurred through a POST request to Google's servers, specifically through the endpoint https://analytics.google.com/g/collect.

132.  The request included detailed metadata, including the search term, the Plaintiff's session identifier, the full URL of the search results page, and technical data about the Plaintiff's device and browser.

133.  Defendant's deployment of Google Analytics failed to activate the "IP anonymization" feature, a standard safeguard provided by Google Analytics to obscure user IP addresses.

134.  Without IP anonymization enabled, Google Analytics collected the full IP address of the Plaintiff's device.

135.  This data, combined with other identifiers such as the session ID and client ID transmitted in the same request, provided Google with the ability to identify and geolocate the Plaintiff with precision.

136.  The omission of IP anonymization allowed Google Analytics to link the Plaintiff's search for sensitive medical terms with the Plaintiff's full IP address,

which is considered personally identifiable information under applicable privacy laws.

137. This enabled Google to associate Plaintiff's sensitive medical search query with a detailed behavioral profile of Plaintiff across other websites that use Google Analytics, further compounding the privacy harm.

138. Defendant's decision to disable or fail to enable IP anonymization in its deployment of Google Analytics was a deliberate choice that prioritized its access to granular data for analytic and commercial purposes over the privacy of its website users.

139. This choice exposed Plaintiff and other users to heightened risks of identification and profiling by third parties, including Google.

140. As a result of these practices, the sensitive medical query for sensitive medical terms was transmitted to Google Analytics, which had the capacity to combine this data with other information it possessed about Plaintiff, including geolocation, demographic data, and online behavior across other websites using Google Analytics.

141. This transmission occurred without any meaningful disclosure to Plaintiff, in violation of Plaintiff's reasonable expectation of privacy.

142. Defendant's use of Google Analytics to intercept and transmit sensitive medical search queries constitutes an unauthorized disclosure of confidential medical information and violates applicable federal and state privacy laws, including, but

Complaint - Class Action

not limited to, the California Confidentiality of Medical Information Act (CMIA) and other statutory and common law protections against the improper disclosure of sensitive personal data.

143. Defendant's actions also violate standards of professional conduct for healthcare providers and businesses handling sensitive medical information.

**Allegations Regarding Defendant's Use of Qualtrics**

**To Intercept And Transmit Sensitive Search Queries**

144. Defendant utilizes Qualtrics, a third-party tracking and analytics platform, to monitor and record user interactions on its website, including searches for sensitive medical information.

145. Upon entering the sensitive medical search term, Defendant intercepted Plaintiff's query and transmitted it instantaneously to Qualtrics' servers via a GET request to the URL https://siteintercept.qualtrics.com/WRSiteInterceptEngine/Targeting.php.

146. This request included detailed metadata and explicitly embedded the search term within the Q_LOC parameter, which contained the full URL of the search results page: https://www.Defendant.com/en/search-results.html?query=XXXXXXXX&page=1&filter=all. (Redacted for privacy.)

147. The transmission occurred without Plaintiff's knowledge or consent.

Complaint - Class Action

148.   The request also included a parameter, hasAnalyticsConsent=null, indicating that Defendant failed to obtain Plaintiff's explicit consent to transmit sensitive medical queries to Qualtrics.

149.   Despite this lack of consent, the request was configured to log Plaintiff's search behavior and transmit sensitive data to Qualtrics' systems, where it could be stored, analyzed, and potentially linked to other behavioral or identifying data.

150.   Through its deployment of Qualtrics, Defendant actively enabled the interception of Plaintiff's search term and other contextual information, including the timestamp of the interaction, the specific search page visited, and other metadata about Plaintiff's browsing session.

151.   This transmission allowed Qualtrics to associate the sensitive search query sensitive medical terms with tracking and profiling mechanisms, in violation of Plaintiff's reasonable expectation of privacy.

152.   The interception and transmission of the sensitive medical terms constitute an unauthorized disclosure of sensitive medical information.

153.   These practices violate applicable federal and state privacy laws, including, but not limited to, the California Confidentiality of Medical Information Act (CMIA) and other statutory and common law protections against the improper disclosure of sensitive personal data.

154.   Defendant's actions further violate established standards for entities entrusted with the handling of confidential medical information, particularly where such

data is shared with third parties for commercial purposes without the knowledge or consent of the affected individuals.

**Allegations Regarding Defendant's Use of Rakanto**

**To Intercept And Transmit Sensitive Search Queries**

155.    Defendant utilizes Rakanto, a third-party data collection and analytics platform, to monitor and analyze user interactions on its website, including the collection and transmission of sensitive user data.

156.    Rakanto specializes in deploying advanced tracking technologies that capture user behavior in real-time, process it for analytics, and transmit the data to centralized servers for further analysis.

157.    Rakanto's services include facilitating data collection through customized scripts embedded in client websites, enabling clients like Defendant to gather detailed metadata about user interactions, including page visits, inputted search queries, and session behavior.

158.    Upon entering the sensitive medical search terms, Defendant intercepted the query and instantaneously intercepted and in real time transmitted it to Rakanto's servers via a POST request to the URL https://cse.rakanto.com/cx_collector/.

159.    This request included detailed metadata about Plaintiff's browsing session and an encrypted payload containing custom data, which Defendant and Rakanto configured to collect sensitive user input, including the sensitive medical search terms.

160. Rakanto's tracking system captured Plaintiff's search term alongside metadata such as session identifiers (pixelSessionId), user identifiers (ubrid), and technical information about Plaintiff's device and browser.

161. These identifiers enabled Rakanto to associate Plaintiff's sensitive search query with a broader profile of Plaintiff's online behavior and interactions during the session.

162. Despite the encryption of the payload, Defendant transmitted the data in a form that allowed Rakanto to decrypt, analyze, and store Plaintiff's sensitive medical query.

163. At no point did Defendant disclose to Plaintiff that their sensitive medical search queries would be intercepted and transmitted to Rakanto.

164. Furthermore, Rakanto's system was configured to process this data without any meaningful anonymization or safeguards against identifying users.

165. Defendant's reliance on Rakanto's services allowed sensitive health-related information to be combined with session and user identifiers, violating Plaintiff's reasonable expectation of privacy.

166. The instantaneous interception and real time transmission of Plaintiff's sensitive medical search terms constitute an unauthorized disclosure of sensitive medical information and violate applicable federal and state privacy laws, including, but not limited to, the California Confidentiality of Medical Information Act (CMIA).

Complaint - Class Action

167.    Additionally, Defendant's practices violate federal and state statutory and common law protections against the improper collection, use, and dissemination of sensitive personal information.

168.    These actions further undermine established standards for safeguarding sensitive data, particularly in the context of healthcare-related services.

## **Warning on Tracking Codes on Health Care Websites**

169.    The federal government has issued guidance warning that tracking codes like the Google Analytics Tag may violate federal privacy law when installed on healthcare websites such as Defendant's.

170.    The statement titled, USE OF ONLINE TRACKING TECHNOLOGIES BY HIPAA COVERED ENTITIES AND BUSINESS ASSOCIATES (the "Bulletin"), was issued by the Department of Health and Human Services' Office for Civil Rights ("OCR") in December 2022. https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html last accessed December 14, 2023.

171.    Healthcare organizations regulated under the Health Insurance Portability and Accountability Act (HIPAA) may use third-party tracking tools, such as the Google Analytics Tag, in a limited way, to perform analysis on data key to operations. They are not permitted, however, to use these tools in a way that may expose patients' PHI to these vendors. The Bulletin explains:

> Regulated entities [those to which HIPAA applies] are not permitted to use tracking technologies in a manner that would result in impermissible

Complaint - Class Action

disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules. *For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures*.

The bulletin then further discusses the types of harm that disclosure may cause to the patient:

An impermissible disclosure of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms to the individual or others. For example, an impermissible disclosure of PHI may result in identity theft, financial loss, *discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI*. Such disclosures can reveal incredibly sensitive information about an individual, *including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment*.

While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, *because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI only as expressly permitted or required by the HIPAA Privacy Rule*.

Id. (footnotes omitted; bold italics added).

172. Plaintiff and Class members face the very same kinds of risks that the government describes concerns about in this bulletin

173. Defendant disclosed the sensitive private medical search terms that Plaintiff's and Class members' entered on Defendant's Website and then immediately broadcast those search terms in real time and simultaneously with her entry to Google and these other Spyware Companies.

174. This search term information is, as described by the OCR in its bulletin, "highly

sensitive."

175.  The Bulletin goes on to make clear how broad the government's view of protected information is. It explains:

This information might include an individual's medical record number, home or email address, or dates of appointments, as well as an individual's IP address or geographic location, medical device IDs, *or any unique identifying code*.

Id. (footnotes omitted; bold italics added).

176.  Crucially, that paragraph in the government's Bulletin continues:

*All such [individually identifiable health information ("IIHI")] collected on a regulated entity's website or mobile app generally is PHI, even if the individual does not have an existing relationship with the regulated entity and even if the IIHI, such as IP address or geographic location, does not include specific treatment or billing information like dates and types of health care services.* This is because, *when a regulated entity collects the individual's IIHI through its website or mobile app, the information connects the individual to the regulated entity (i.e., it is indicative that the individual has received or will receive health care services or benefits from the covered entity), and thus relates to the individual's past, present, or future health or health care or payment for care*.

Id. (footnotes omitted; bold italics added).

177.  Then, in July 2022, the Federal Trade Commission ("FTC") and the Department of Health and Human Services ("HHS") issued a joint press release warning regulated entities about the privacy and security risks arising from the use of online tracking technologies:

The Federal Trade Commission and the U.S. Department of Health and Human Services' Office for Civil Rights (OCR) are cautioning hospitals and telehealth providers [regulated entities] about the privacy and security risks related to the use of online tracking technologies integrated into their websites or mobile apps that may be impermissibly disclosing consumers' sensitive

personal health data to third parties.

"When consumers visit a hospital's [regulated entity's] website or seek telehealth services, they should not have to worry that their most private and sensitive health information may be disclosed to advertisers and other unnamed, hidden third parties," said Samuel Levine, Director of the FTC's Bureau of Consumer Protection. "The FTC is again serving notice that companies need to exercise extreme caution when using online tracking technologies and that we will continue doing everything in our powers to protect consumers' health information from potential misuse and exploitation."

"Although online tracking technologies can be used for beneficial purposes, patients and others should not have to sacrifice the privacy of their health information when using a hospital's [regulated entity's] website," said Melanie Fontes Rainer, OCR Director. "OCR continues to be concerned about impermissible disclosures of health information to third parties and will use all of its resources to address this issue."

The two agencies sent the joint letter to approximately 130 [regulated entities] hospital systems and telehealth providers to alert them about the risks and concerns about the use of technologies, such as the Meta/Facebook pixel and Google Analytics, that can track a user's online activities. These tracking technologies gather identifiable information about users, usually without their knowledge and in ways that are hard for users to avoid, as users interact with a website or mobile app.

In their letter, both agencies reiterated the risks posed by the unauthorized disclosure of an individual's personal health information to third parties. For example, the disclosure of such information could reveal sensitive information including health conditions, diagnoses, medications, medical treatments, frequency of visits to health care professionals, and where an individual seeks medical treatment.

. . . Through its recent enforcement actions against BetterHelp, GoodRx and Premom, as well as recent guidance from the FTC's Office of Technology, the FTC has put companies on notice that they must monitor the flow of health information to third parties that use tracking technologies integrated into websites and apps. The unauthorized disclosure of such information may violate the FTC Act and could constitute a breach of security under the FTC's Health Breach Notification Rule . . .

Complaint - Class Action

https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-hhs-warn-hospital-systems-telehealth-providers-about-privacy-security-risks-online-tracking last accessed December 14, 2024.

178. Defendant's conduct with respect to its Website data sharing practices is directly contrary to clear pronouncements by the FTC and HHS.

## CLASS ACTION ALLEGATIONS

179. Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23 individually and on behalf of a class defined as all natural persons in the United States who, during the class period, visited the Defendant's Website (the "Class").

180. Plaintiff also brings this action on behalf of a subclass defined as all natural persons in California who, during the class period, visited the Website (the "California Subclass") (together with the Class, the "Classes").

181. Subject to additional information obtained through further investigation and discovery, the above-described Classes may be modified or narrowed as appropriate, including through the use of multi-state subclasses.

182. The "Class Period" is the time beginning on the date established by the Court's determination of any applicable statute of limitations, after consideration of any tolling, concealment, and accrual issues, and ending on the date of entry of judgment.

183. Excluded from the Classes is Defendant; any affiliate, parent, or subsidiary of

Complaint - Class Action

Defendant; any entity in which Defendant has a controlling interest; any officer, director, or employee of Defendant; any successor or assign of Defendant; anyone employed by counsel in this action; any judge to whom this case is assigned, his/her spouse and immediate family members; and members of the judge's staff.

184. **Numerosity**. Members of the Classes are so numerous that joinder of all members is impracticable. The exact number of Class Members is unknown to Plaintiff at this time; however, it is estimated that there are at least thousands of individuals in the Classes. The identity of such membership is readily ascertainable from Defendant's records.

185. **Typicality**. Plaintiff's claims are typical of the claims of the Classes because Plaintiff used the Website to research and review sensitive medical conditions and had their personally identifiable information and protected health information disclosed to Google and the other Spyware Companies without their express written authorization or knowledge. Plaintiff's claims are based on the same legal theories as the claims of other Class Members.

186. **Adequacy**. Plaintiff is prepared to take all necessary steps to represent fairly and adequately the interests of the Class Members. Plaintiff's interests are coincident with, and not antagonistic to, those of the members of the Classes. Plaintiff is represented by attorneys with experience in the prosecution of class action litigation, generally, and in the emerging field of digital privacy litigation, specifically. Plaintiff's attorneys are committed to vigorously prosecuting this

action on behalf of the members of the Classes.

187. **Commonality**. Questions of law and fact common to the members of the Classes predominate over questions that may affect only individual members of the Classes because Defendant has acted on grounds generally applicable to the Classes. Such generally applicable conduct is inherent in Defendant's wrongful conduct. Questions of law and fact common to the Classes include:

a. Whether Defendant intentionally tapped the lines of internet communication between patients and their healthcare provider;

b. Whether the Website surreptitiously recorded personally identifiable information, protected health information, and related communications and subsequently, or simultaneously, disclosed that information to Google and the other Spyware Companies;

c. Whether Google and the other Spyware Companies are third-party eavesdroppers;

d. Whether Defendant's disclosures of personally identifiable information, protected health information, and related communications constituted an affirmative act of communication;

e. Whether Defendant's conduct, which allowed Google and the other Spyware Companies—unauthorized persons— to view Plaintiff's and Class Members' personally identifiable information and protected health information, resulted in a breach of confidentiality;

44

f.  Whether Defendant violated Plaintiff's and Class Members' privacy rights by using the Google Analytics Tag and the other Spyware Companies' other software to record and communicate patients' confidential medical communications;

g.  Whether Plaintiff and Class Members are entitled to damages under the ECPA, CIPA, the CMIA, or any other relevant statute; and

h.  Whether Defendant's actions violated Plaintiff's and Class Members' privacy rights as provided by the California Constitution.

188.  **Superiority**.  Class action treatment is the superior method for the fair and efficient adjudication of this controversy.  Such treatment permits a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweigh any potential difficulties in the management of this class action.  Plaintiff knows of no special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

# **CLAIMS FOR RELIEF**

## **COUNT I.**

Complaint - Class Action

**Violation of the Electronic Communications Privacy Act, 18 U.S.C. § 2511(1)**

189.  Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein and brings this count individually and on behalf of the members of the Class.

190.  The Electronic Communications Privacy Act ("ECPA") prohibits the intentional interception of the content of any electronic communication. 18 U.S.C. § 2511. The ECPA protects both sending and the receipt of communications.

191.  18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

192.  The transmission of Plaintiff's private and confidential information to Defendant's Website qualify as a "communication" under the ECPA's definition of 18 U.S.C. § 2510(12).

193.  The transmission of the private and confidential information between Plaintiff and Class Members and Defendant's Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

194.  The ECPA defines "contents," when used with respect to electronic

Complaint - Class Action

communications, to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. 18 U.S.C. § 2510(8).

195. The ECPA defines an interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

196. The ECPA defines "electronic, mechanical, or other device," as "any device…which can be used to intercept a[n]…electronic communication[.]" 18 U.S.C. § 2510(5).

197. The following instruments constitute "devices" within the meaning of the ECPA:

   a. The computer codes and programs Google and the other Spyware Companies used to track Plaintiff and Class Members communications while they were navigating the Website;

   b. Plaintiff's and Class Members' browsers;

   c. Plaintiff's and Class Members' mobile devices;

   d. Defendant and Google's and the other Spyware Companies' web and ad servers;

   e. The plans Defendant and Google and the other Spyware Companies carried out to effectuate the tracking and interception of Plaintiff's and Class Members' communications while they were using a web browser to navigate the Website.

198. Plaintiff and Class Members' interactions with Defendant's Website are

electronic communications under the ECPA.

199. By utilizing and embedding the Google Analytics Tag and the other software provided by the other Spyware Companies on its Website, Defendant intentionally intercepted in real time and while in transit, endeavored to intercept, and/or procured another person to intercept, the electronic communications of Plaintiff and Class Members in violation of 18 U.S.C. § 2511(1)(a).

200. Specifically, Defendant intercepted in real time and while in transit Plaintiff's and Class Members' electronic communications through the Google Analytics Tag and other Spyware Companies' software implementations on its website, which tracked, stored and unlawfully disclosed Plaintiff's and Class Members' private and confidential information to third parties, such as Google.

201. Defendant intercepted in real time and while in transit or assisted in the interception of communications that include, but are not necessarily limited to, communications to/from Plaintiff and Class Members regarding private and confidential information, including their Google account and treatment information. This confidential information was then monetized for targeted advertising purposes.

202. By intentionally disclosing or endeavoring to disclose Plaintiff's and Class Members' electronic communications to Google and the other Spyware Companies, their affiliates and other third parties, while knowing or having reason to know that the information was obtained through the interception of an

Complaint - Class Action

electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

203. By intentionally using, or endeavoring to use, the contents of Plaintiff's and Class Members' electronic communications, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

204. Defendant intentionally intercepted in real time and while in transit or intentionally assisted in the interception of the contents of Plaintiff's and Class Members' electronic communications for the purpose of committing a criminal or tortious act in violation of the Constitution or laws of the United States or of any state, namely, invasion of privacy, among others.

205. The party exception in 18 U.S.C. § 2511(2)(d) does not permit a party that intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State. Here, as alleged above, Defendant violated a provision of the Health Insurance Portability and Accountability Act, specifically 42 U.S.C. § 1320d-6(a)(3). This provision imposes a criminal penalty for knowingly disclosing individually identifiable health information ("IIHI") to a third party. HIPAA defines IIHI as:

> any information, including demographic information collected from an individual,

that—(A) is created or received by a health care provider ... (B) relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual, and (i) identifies the individual; or (ii) with respect to which there is a reasonable basis to believe that the information can be used to identify the individual.

42 U.S.C. § 1320d-6.

206. Plaintiff's information that Defendant assisted Google in intercepting qualifies as IIHI, and Defendant violated Plaintiff's and Class Members' expectations of privacy. Such conduct constitutes tortious and/or criminal conduct through a violation of 42 U.S.C. § 1320d-6. Defendant used the wire or electronic communications to increase their profit margins. Defendant specifically used the Google Analytics Tag and the other software implemented by Defendant from the other Spyware Companies to track and utilize Plaintiff's and Class Members' private and confidential information for financial gain.

207. Defendant was not acting under the color of law to intercept Plaintiff's and Class Members' wire or electronic communications.

208. Plaintiff and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading Plaintiff's and Class Members' privacy through the Google Analytics Tag or the other software implemented on Defendant's Website from the Spyware Companies.

209. Plaintiff and Class Members had a reasonable expectation that Defendant would not intercept or assist in the interception of their private and confidential

information without their knowledge or consent.

210. The foregoing acts and omission therefore constitute numerous violations of 18 U.S.C. § 2511(1), *et seq.*

211. As a result of each and every violation thereof, on behalf of himself and the Class, Plaintiff seeks statutory damages of $10,000 or $100 per day for each violation of 18 U.S.C. § 2510, *et seq.* under 18 U.S.C. § 2520.

## COUNT II.

### Violation of the California Invasion of Privacy Act, Cal. Penal Code § 631

212. Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein and brings this count individually and on behalf of the members of the California Subclass.

213. The California Invasion of Privacy Act ("CIPA") is codified at California Penal Code sections 630 to 638. CIPA begins with its statement of purpose – namely, that the purpose of CIPA is to "protect the right of privacy of the people of [California]" from the threat posed by "advances in science and technology [that] have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications" Cal. Penal Code § 630.

214. A person violates California Penal Code § 631(a), if:

by means of any machine, instrument, or contrivance, or in any other manner, [s/he] intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system, or [s/he] willfully and without the consent of all parties to the communication, or in any

51

unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or [s/he] uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained . . . .

Cal. Penal Code § 631(a).

215. Further, a person violates Section 631(a) if s/he "aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned" in the preceding paragraph. *Id.*

216. To avoid liability under Section 631(a), a defendant must show it had the consent of **all** parties to a communication.

217. At all relevant times, Defendant aided, agreed with, and conspired with Google and the other Spyware Companies to track and intercept Plaintiff's and Class Members' internet communications while accessing the Website. These communications were intercepted in real time and while in transit without the authorization and consent of Plaintiff and Class Members.

218. Defendant, when aiding and assisting Google's Google and the other Spyware Companies' wiretapping and eavesdropping, intended to help those third parties learn some meaning of the content in the URLs, the specific search terms typed in by the website's visitor, and the content the visitor requested.

219. The following items constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA, and even if they do not, the Google Analytics Tag and the software implemented by Defendant from the other Spyware Companies falls

under the broad catch-all category of "any other manner":

a. The computer codes and programs Google and the other Spyware Companies used to track Plaintiff and Class Members' communications while they were navigating the Website

b. Plaintiff's and Class Members' browsers;

c. Plaintiff's and Class Members' computing and mobile devices;

d. Google's and the other Spyware Companies' web and ad servers;

e. The web and ad-servers from which Google and the other Spyware Companies tracked and intercepted in real time and while in transit Plaintiff's and Class Members' communications while they were using a web browser to access or navigate the Website;

f. The computer codes and programs used by Google and the other Spyware Companies to effectuate its tracking and interception of Plaintiff's and Class Members' communications while they were using a browser to visit the Website; and

g. The plans Google and the other Spyware Companies carried out to effectuate its tracking and interception of Plaintiff's and Class Members' communications while they were using a web browser or mobile device to visit the Website.

220. The information that Defendant transmitted using the Google Analytics Tag, including the appointment location, the type of procedure a patient is interested

in, the specific procedure they want completed, the reason for the procedure, the provider they wish to see, the day, and time for the appointment constituted sensitive and confidential personally identifiable information.

221. As demonstrated hereinabove, Defendant violated CIPA by aiding and permitting third parties to receive its customers' sensitive and confidential online communications through the Website without their consent.

222. As a result of the above violations, Defendant is liable to Plaintiff and other Class Members in the amount of, the greater of, $5,000 dollars per violation or three times the amount of actual damages. Additionally, California Penal Code section 637.2 specifically states that "[it] is not a necessary prerequisite to an action pursuant to this section that the plaintiff has suffered, or be threatened with, actual damages."

223. Under the statute, Defendant is also liable for reasonable attorney's fees, and other litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by Defendant in the future.

## **COUNT III.**

### **Violation of the California Confidentiality of Medical Information Act Cal. Civ. Code § 56.10**

224. Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein and brings this claim individually and on behalf of the proposed

1    California Subclass.

2    225.  Under the California Confidentiality of Medical Information Act, California

3          Civil Code section 56.10 ("CMIA"), providers of health care are prohibited from

4

5          disclosing medical information relating to their patients without a patient's

6          authorization. Medical information refers to:

7

8               any individually identifiable information, in electronic or physical form, in
                possession of or derived from a provider of health care . . . regarding a
9               patient's medical history, mental or physical condition, or treatment.
                "Individually Identifiable" means that the medical information includes or
10              contains any element of personal identifying information sufficient to
                allow identification of the individual .
11
                . . .
12

13   226.  Plaintiff and Class Members are patients under the definition of the CMIA

14         because Plaintiff and Class Members received "health care services from a

15

16         provider of health care" and the information Defendant shared to Google and the

17         other Spyware Companies was "medical information pertain[ing]" to Plaintiff and

18
           Class Members. Cal. Civ. Code § 56.05(m).
19

20   227.  Defendant is a "provider of health care" as defined in California Civil Code

21         section 56.05(p) because Defendant offers various cosmetic medical services.

22
           Defendant is also considered a "provider of health care" under California Civil
23
           Code section 56.06, subdivisions (a) and (b), because Defendant's Website
24

25         maintains medical information and offers software to consumers that is designed

26         to maintain medical information for the purposes of allowing its users to manage

27
           their information or make the information available to a health care provider, of
28

for the diagnoses, treatment, or management of a medical condition.

228.   Therefore, as a provider of health care, Defendant is subject to the requirements of the CMIA and had an ongoing obligation to comply with the CMIA's requirements regarding the maintenance of its user's medical information.

229.   As set forth hereinabove, the unique identifiers alleged in this Complaint in Figure 1 above are identifiers sufficient to allow identification of an individual.

230.   Along with patients' various unique identifiers shown in Figure 1, Defendant disclosed to Google and the other Spyware Companies several pieces of information regarding its patients' use of Defendant's Website that included, but was not limited to, patient medical conditions and treatment search terms searched for by website visitors.

231.   This patient information was derived from a provider of health care regarding patients' medical treatment and physical condition. Accordingly, it constituted medical information pursuant to the CMIA.

232.   As demonstrated hereinabove, Defendant failed to obtain its patients' valid authorization for the disclosure of medical information.

233.   Pursuant to CMIA section 56.11, a valid authorization for disclosure of medical information must: (1) be "[c]learly separate from any other language present on the same page and is executed by a signature which serves no other purpose than to execute the authorization;" (2) be signed and dated by the patient or her representative; (3) state the name and function of the third party that receives the

information; and (4) state a specific date after which the authorization expires. Accordingly, information set forth in Defendant's Website Privacy Policy does not qualify as a valid authorization.

234. Based on the above, Defendant violated the CMIA by disclosing its patients' medical information to Google and the other Spyware Companies.

235. Under the CMIA, a patient may recover compensatory damages, punitive damages not to exceed $3,000 dollars and attorneys' fees not to exceed $1,000, and the costs of litigation for any violating disclosure of medical information. Cal. Civ. Code §56.35. Alternatively, a patient may recover nominal damages of $1,000 for any negligent release of medical information. Cal. Civ. Code §56.36.

236. Pursuant to California Penal Code section 637.2, Plaintiffs and Class Members have been injured by the violations of California Penal Code section 635, and each seek damages for the greater of $5,000 or three times the amount of actual damages, as well as injunctive relief.

## COUNT IV.

### Invasion of Privacy Under California's Constitution

237. Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein and brings this claim individually and on behalf of the proposed California Subclass.

238. Plaintiff and Class Members have an interest in: (1) precluding the dissemination and/or misuse of their sensitive, confidential online communications and

Complaint - Class Action

protected health information; and (2) making personal decisions and/or conducting personal activities without observation, intrusion or interference, including, but not limited to, the right to visit and interact with various internet sites without being subjected to wiretaps without Plaintiff's and Class Members' knowledge or consent.

239. At all relevant times, by using the Google Analytics Tag to record and communicate patients' sensitive and confidential online medical communications, Defendant intentionally invaded Plaintiff's and Class Members' privacy rights under the California Constitution.

240. Plaintiff and Class Members had a reasonable expectation that their sensitive and confidential online communications, identities, health information, and other data would remain confidential, and that Defendant would not install wiretaps on the Website.

241. Plaintiff and Class Members did not authorize Defendant to record and transmit Plaintiff's and Class Members' private medical communications alongside their personally identifiable health information to Google and the other Spyware Companies

242. This invasion of privacy was serious in nature, scope, and impact because it related to patients' private medical communications. Moreover, it constituted an egregious breach of the societal norms underlying the privacy right.

243. Accordingly, Plaintiff and Class Members seek all relief available for invasion of

Complaint - Class Action

privacy claims under California's Constitution.

## COUNT V.

**Violation of the California Computer Data Access and Fraud Act**

**Cal. Penal Code. § 502**

244. Plaintiff repeats, re-alleges, and incorporates by reference, all other paragraphs.

245. The California legislature enacted the CDAFA with the intent of "expand[ing] the degree of protection afforded to individuals . . . from tampering, interference, damage, and unauthorized access to lawfully created computer data and computer systems." Cal. Penal Code § 502(a). The enactment of CDAFA was motivated by the finding that "the proliferation of computer technology has resulted in a concomitant proliferation of . . . unauthorized access to computers, computer systems, and computer data." *Id.*

246. Plaintiff's and Class members' mobile computing devices and personal computers containing Defendant's Securly software constitute "computers" within the scope of the CDAFA.

247. Defendant violated the CDAFA Section 502(c)(1), which makes it unlawful to "knowingly access[] and without permission . . . use[] any data, computer, computer system, or computer network in order to either (A) devise or execute any scheme or artifice to defraud, deceive, or extort, or (B) wrongfully control or obtain money, property, or data;"

248. Defendant violated the CDAFA Section 502(c)(2), which makes it unlawful to

Complaint - Class Action

"knowingly accesses and without permission takes, copies, or makes use of any data from a computer, computer system, or computer network, or takes or copies any supporting documentation, whether existing or residing internal or external to a computer, computer system, or computer network;"

249. Defendant violated the CDAFA Section 502(c)(7), which makes it unlawful to "knowingly and without permission accesses or causes to be accessed any computer, computer system, or computer network."

250. Defendant knowingly accessed Plaintiff's and Class members' computers without their permission by including within the third-party Spyware Company software described herein, which intercepts and transmits data, communications, and personal information concerning Plaintiff and Class members.

251. Defendant used data, communications, and personal information that it intercepted in real time and while in transit and took from Plaintiff's and Class members' computers to wrongfully and unjustly enrich itself at the expense of Plaintiff and Class members.

252. Defendant took, copied, intercepted in real time and while in transit, and made use of data, communications, and personal information from Plaintiff's and Class members' computers.

253. Defendant knowingly and without Plaintiff's and Class members' permission accessed or caused to be accessed their computers, by installing its third-party Spyware Companies' software without Plaintiff's and Class members' informed

consent, a software that intercepts and/or takes data, communications, and personal information concerning Plaintiff and Class members.

254. Plaintiff and Class members are residents of California and used their computers in California at all relevant times in which Defendant made such unauthorized access.

255. Defendant accessed or caused to be accessed Plaintiff's and Class members' data, communications, and personal information from California.

256. Defendant uses data servers that are in part located in California and allow Defendant to access and process the data, communications and personal information concerning Plaintiff and Class members.

257. Defendant was unjustly enriched by intercepting, acquiring, taking, or using Plaintiff's and Class members' data, communications, and personal information without their permission, and using it for Defendant's own financial benefit. Defendant has been unjustly enriched in an amount to be determined at trial.

258. As a direct and proximate result of Defendant's violations of the CDAFA, Plaintiff and Class members suffered damages.

259. Pursuant to CDAFA Section 502(e)(1), Plaintiff and Class members seek compensatory, injunctive and equitable relief in an amount to be determined at trial.

260. Pursuant to CDAFA Section 502(e)(2), Plaintiff and Class members seek an award of reasonable attorneys' fees and costs.

Complaint - Class Action

261.  Pursuant to CDAFA Section 502(e)(4), Plaintiff and Class members seek punitive or exemplary damages for Defendant's willful violations of the CDAFA.

## COUNT VI.

### Use of a Pen Register or Trap and Trace Device

### Cal. Penal Code § 638.51

262.  Plaintiff repeats, re-alleges, and incorporates by reference, all other paragraphs.

263.  California Penal Code Section 638.50(b) defines a "pen register" as "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication."

264.  California Penal Code Section 638.51 prohibits any person from using a pen register without a court order.

265.  Defendant's third-party software from Google and other Spyware Companies installed on Plaintiffs' and other Class Members' devices by its Website constitutes a "pen register" because it is a device or process that records addressing or signaling information—Plaintiff's and Class members' location data and other sensitive personal information—from the electronic communications transmitted by their computers.

266.  Defendant was not authorized by any court order to use a pen register to track Plaintiff's and Class members' location data and personal information.

267. As a direct and proximate result of Defendant's conduct, Plaintiff and Class members suffered losses and were damaged in an amount to be determined at trial.

### COUNT VII.

### Violation of the Computer Fraud and Abuse Act

### 18 U.S.C. § 1030

268. Plaintiff repeats, re-alleges, and incorporates by reference, all other paragraphs.

269. Plaintiff alleges that Defendant violated the Computer Fraud and Abuse Act (CFAA), 18 U.S.C. § 1030(a)(2)(C), by intentionally accessing Plaintiffs' and Class Members' devices without authorization, or by exceeding authorized access, to obtain information from protected computers used in interstate or foreign commerce.

270. Plaintiff's device qualifies as "protected computers" under the CFAA, as they are connected to the internet and used in interstate communications.

271. Plaintiff further alleges that Defendant intentionally accessed Plaintiff's and Class Members' protected computers to obtain private and sensitive information, including but not limited to geolocation data, search histories, keystrokes, communications, and page viewing activities, without authorization or consent, in violation of 18 U.S.C. § 1030(a)(2).

272. As a direct and proximate result of Defendant's unauthorized access, Plaintiff and Class Members suffered loss and damage, including the invasion of their

privacy and the unauthorized use of their personal information. Plaintiffs allege that Defendant's violations of the CFAA entitle them to recover compensatory damages and injunctive relief under 18 U.S.C. § 1030(g).

273. The statute provides that any person suffering damage or loss due to a violation may maintain a civil action to obtain compensatory damages, injunctive relief, or other equitable relief.

274. Plaintiff alleges that Defendant's actions caused "loss" as defined by 18 U.S.C. § 1030(e)(11), which includes the impairment of the integrity and availability of data, programs, and systems on Plaintiff and Class Members' protected computers.

275. As a result of Defendant's conduct, Plaintiff and Class Members are entitled to recover damages in an amount to be proven at trial, including statutory damages for any damage or loss caused by Defendant's unauthorized access.

## COUNT VIII.

### Violation of the Stored Communications Act

### 18 U.S.C. § 2701

276. Plaintiff repeats, re-alleges, and incorporates by reference, all other paragraphs.

277. Plaintiff also alleges that Defendant violated the Stored Communications Act (SCA), 18 U.S.C. § 2701(a), by intentionally accessing Plaintiffs' and Class Members' electronic communications stored on their devices without authorization.

278.   Defendant accessed and obtained stored electronic communications, including search history, messages, and other data, without proper consent.

279.   Plaintiff further alleges that Defendant exceeded any authorized access by using its spyware software from Google and the other Spyware Companies to access and disclose Plaintiff's and Class Members' stored electronic communications for commercial gain, in violation of 18 U.S.C. § 2701(a)(1) and (a)(2).

280.   As a result of Defendant's violations of the Stored Communications Act, Plaintiff and Class Members are entitled to statutory damages of no less than $1,000 per violation under 18 U.S.C. § 2707(c).

281.   Additionally, Plaintiff and Class Members are entitled to recover punitive damages under the SCA if it is established that Defendant acted with willful or intentional disregard for the privacy rights of Plaintiff and Class Members.

282.   Plaintiff seeks compensatory damages, statutory damages, punitive damages (as applicable), and injunctive relief for Defendant's violations of both the CFAA and the SCA, along with reasonable attorneys' fees and costs as provided under 18 U.S.C. §§ 1030(g) and 2707(b), respectively.

## COUNT IX.

### Violation of the Federal Wiretap Act

### 18 U.S.C. § 2511

283.   Plaintiff repeats, re-alleges, and incorporates by reference, all other paragraphs.

284.   Plaintiff alleges that Defendant violated the Federal Wiretap Act, 18 U.S.C. §

2511, by intentionally intercepting the electronic communications of Plaintiff and Class Members while they were using school-issued devices.

285.  These communications included private messages, search histories, and other digital communications that were intercepted in real time and while in transit and transmitted to unauthorized third-party Spyware Companies in real-time.

286.  Plaintiff further alleges that Defendant's interception of these communications occurred without the consent of the Plaintiff or Class Members, as required under 18 U.S.C. § 2511(1)(a).

287.  Defendant's actions were taken without proper legal authorization or consent, constituting a violation of the Federal Wiretap Act.

288.  The communications intercepted in real time and while in transit by Defendant included highly sensitive personal information, including but not limited to, search queries, messages, and browsing activity conducted on their devices.

289.  Defendant's actions in intercepting these communications were done for the purpose of using the data for commercial gain, including targeting Plaintiff and Class Members for marketing or other purposes.

290.  As a result of Defendant's violations of the Federal Wiretap Act, Plaintiff and Class Members are entitled to statutory damages of $100 per day for each day of violation or $10,000 per violation, whichever is greater, as provided by 18 U.S.C. § 2520(c)(2).

291.  Plaintiff and Class members are further entitled to punitive damages under 18

U.S.C. § 2520(b)(2) due to the willful and intentional nature of Defendant's conduct in intercepting Plaintiffs' and Class Members' communications without authorization.

292.  Additionally, Plaintiffs seek injunctive relief to prevent further violations, along with the recovery of reasonable attorneys' fees and costs as provided under 18 U.S.C. § 2520(b)(3).

293.  Plaintiff seeks compensatory damages, statutory damages, punitive damages (where applicable), and injunctive relief for Defendant's violations of the Federal Wiretap Act, along with reasonable attorneys' fees and costs as provided by the statute.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

a)  For a determination that this action is a proper class action;

b)  For an order certifying the Classes, naming Plaintiff as representative of the Classes, and naming Plaintiff's attorneys as Class Counsel to represent the Classes;

c)  For an order declaring that Defendant's conduct violates the statutes referenced herein;

d)  For an order finding in favor of Plaintiff and the Classes on all counts asserted herein;

Complaint - Class Action

e) An award of statutory damages to the extent available;

f) For punitive damages, as warranted, in an amount to be determined at trial;

g) For prejudgment interest on all amounts awarded;

h) For injunctive relief as pleaded or as the Court may deem proper; and

i) For an order awarding Plaintiff and the Classes their reasonable attorneys' fees and expenses and costs of suit.

### JURY TRIAL DEMANDED

Pursuant to the Seventh Amendment to the Constitution of the United States of America, Plaintiffs and Class Members are entitled to, and demand, a trial by jury.

Respectfully submitted,

**Swigart Law Group**

Date:  January 6, 2025                    By: _s/ Joshua Swigart_
Joshua B. Swigart, Esq.
Josh@SwigartLawGroup.com
Attorneys for Plaintiffs
and the Putative Class

68

Complaint - Class Action